101 F.3d 702
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PNC SECURITIES CORPORATION, Plaintiff-Appellee,
v.
FINANZ-UND GMBH-LIEDGENS; Herbert Liedgens; MCC
International; Jean Baptiste Pierini;
Gessellschaft Finanz-Vermittiung; Frank
Josef Takczick, Defendants,
Ekkehard Sahm, Defendant-Appellant.
 No. 95-5258.
 United States Court of Appeals, Sixth Circuit.
 Nov. 14, 1996.
 
 Before: BOGGS and MOORE, Circuit Judges; and HILLMAN, District Judge.*
 PER CURIAM.
 
 
 1
 Ekkehard Sahm appeals from a garnishment order, attacking the jurisdiction of the court that originally entered the judgment justifying the later garnishment, the use by opposing counsel of information gained in settlement negotiations to attach certain funds, and the procedural underpinnings of the garnishment, including the forms used and the appellee's temporary failure to have them notarized. Because Sahm's claims are all either unreviewable on appeal for a variety of reasons, including that his notice of appeal does not cover some and some were not raised below, or are generally without merit, we affirm the decision of the district court in all respects.
 
 
 2
 * Ekkehard Sahm ("Sahm"), a German national, appears to have been a part of a scheme to sell fraudulent financial instruments. The parties do not explain the background of the scheme in any detail, but it appears to have involved selling Shell Oil bonds that should have been canceled (but were not) to PNC Securities Corporation ("PNC"), a wholly owned subsidiary of PNC Bank. The fraudulent transaction cost PNC approximately $1,000,000. As a result, Sahm was indicted and tried for securities and wire fraud in the United States District Court for the Western District of Kentucky. The trial resulted in a hung jury, but Sahm decided to enter an Alford plea (North Carolina v. Alford, 400 U.S. 25 (1970)), to the charges, pursuant to a plea agreement. Sahm served about 6 months in federal prison after receiving credit for about 9 months spent in local jails awaiting trial. This appeal concerns the tactics used by PNC to try to recover some of its losses, and touches only tangentially on the underlying criminal conviction.
 
 
 3
 PNC began its efforts to recoup its losses in Pittsburgh, in the United States District Court for the Western District of Pennsylvania. There, PNC obtained a judgment against Sahm in the amount of $1,078,684.72, plus interest at the legal rate from November 16, 1991, due to his involvement in the negotiation of the fraudulent bonds. The jurisdiction of the Pennsylvania court over Sahm is one of the contested matters in this appeal, since Sahm maintains that he was "tricked" into coming to Pittsburgh under the pretense of an opportunity to negotiate with PNC. Instead, he was served with process and the FBI took him back to Kentucky to face criminal charges.
 
 
 4
 After obtaining the judgment in Pittsburgh, PNC tried to collect against Sahm back in Kentucky. An associate of Sahm's in Germany, Gerhard Thun ("Thun"), wired $200,000 to Sahm's attorney, Frank Mascagni, in Louisville. Mascagni, during questioning by PNC's counsel in Judge Heyburn's chambers regarding the possible existence of funds belonging to Sahm, stated that Thun entrusted the money to him as legal counsel for Sahm to use as required to effect Sahm's freedom. Sahm's wife wrote a letter from Germany to the effect that the funds were a loan from Thun that the Sahms would have to repay. Mascagni and Sahm have consistently maintained that the funds belong to neither of them, but rather are held in an escrow account for the purpose of eventually making restitution if Sahm is released early from prison. PNC has maintained that the funds enjoy no special status and are merely Sahm's money being held by Mascagni. Regardless of their precise legal status, PNC saw a source of recoupment and went after it.
 
 
 5
 PNC's efforts to garnish these funds provided the last chapter in this story below. On June 29, 1994, the civil judgment from the Western District of Pennsylvania was registered in the Western District of Kentucky, and PNC obtained an order of garnishment (first order). Unfortunately, PNC obtained the order of garnishment forms from the Commonwealth of Kentucky and failed to comply exactly with the requirement of these forms by neglecting to have the declaration notarized by completing the jurat on the form. One week later, July 6, 1994, PNC amended the affidavit to include a jurat. PNC claims that this amended affidavit was filed in federal court before Mascagni's response to the order of garnishment was filed. They were actually filed in court on the same date, but PNC claims it filed first and notes that Mascagni only mailed his service copy on that date. A second order of garnishment was issued by the district court on July 6, 1994.
 
 
 6
 Mascagni filed two responses to the orders of garnishment. The first, filed on July 6, argued the first order was defective because of the absence of the jurat. The second, filed on July 14, alleged that (1) the district court did not have jurisdiction because of the initial defective pleading; and (2) Mascagni held "no U.S. money belonging to the judgment debtor, Mr. Ekkehard Sahm."
 
 
 7
 The final procedural oddity in the case occurred because PNC took Mascagni's claim that he had none of Sahm's money at face value, and thus thought that he had emptied the "escrow" account. On August 17, 1994, however, PNC learned that Mascagni still had the bulk of these funds because Mascagni wrote a letter to Barbara Cravens, an employee of the District Court Clerk's office, stating he still had certain funds, and the letter "came to the attention of PNC's counsel." Appellee's Brief at 10. The next day, PNC served the second order of garnishment on Mascagni and filed a motion asking for discovery concerning Mascagni's factual allegations regarding ownership of funds.
 
 
 8
 On September 8, 1994, a hearing was held before Judge Heyburn, where PNC deposed Mascagni regarding the funds. Mascagni testified to a loosely structured transaction in which Thun transferred the funds to him without a written agreement but under an oral understanding that the funds were entrusted to Mascagni to bring about Sahm's release. On November 29, 1994, Mascagni filed a memorandum asserting that the funds could not be garnished because they were in an escrow account.
 
 
 9
 On January 10, 1995, the district court held that the funds belonged to Sahm and were subject to garnishment. The court found that Sahm was obligated to repay the funds to Thun, that he owned and controlled the use of the funds, and that no escrow had been created. The court therefore ordered Mascagni to turn over all funds left in the account. Mascagni responded instead by filing a motion to extend the time for filing a motion under Rule 59(e), Fed.R.Civ.P., to alter or amend the order. The court gave Mascagni until February 21, 1995 to file his motion. On February 9, 1995, Mascagni filed a notice of appeal of the district court's January 10 order sustaining garnishment. Then, on February 21, 1995, Mascagni filed a motion before the district court to alter or amend the court's order.
 
 
 10
 This motion raised two issues for the first time: (1) the alleged lack of personal jurisdiction by the United States District Court for the Western District of Pennsylvania when it entered the judgment upon which the garnishment rested; and (2) the alleged violation of confidentiality of matters stemming from the civil settlement negotiations (presumably related to either (or both) the letter to Cravens or the in-chambers deposition of Mascagni). The district court denied this motion on April 7, 1995, and, at the same time, directed Mascagni to turn over $179,013.62 plus the interest accrued since June 29, 1994. Mascagni failed to file an amended notice of appeal following the entry of this order.
 
 II
 
 11
 Sahm argues that he can defeat garnishment of the Mascagni funds by attacking the jurisdiction of the federal district court that rendered the original judgment against him. He claims that the district court did not have personal jurisdiction over him. There are serious and dispositive procedural problems with his argument, in addition to the fact that we lack a proper factual record to afford any type of review here. Since this jurisdictional issue was only raised in the motion to amend the district court's order validating garnishment, there was no effort on anyone's part to develop the facts surrounding the alleged "trick" that brought Sahm into Pennsylvania.
 
 
 12
 First and foremost, however, this issue is barred because it was not appealed. Our circuit has noted that such a notice of appeal is "a mandatory and jurisdictional prerequisite which this court can neither waive nor extend." Searcy v. City of Dayton, 38 F.3d 282, 287 (6th Cir.1994) (citing Browder v. Director, Dept. of Corrections of Ill., 434 U.S. 257, 264 (1978)). The only notice of appeal filed by Sahm relates only to the January 10, 1995, order of the court, which included no disposition of the jurisdiction issue. In fact, this issue was not even raised until Sahm included it in his February 21, 1995 motion to alter or amend the January 10th order.
 
 
 13
 Although the motion to alter or amend was denied on April 7, 1995, and Sahm could have appealed from this denial, he did not file a new notice of appeal or amend his old notice. The original notice thus is effective only as to those issues that were before the district court when it entered its order of January 10, 1995. Further, Rule 4 of the Federal Rules of Appellate Procedure states that "[a]ppellate review of an order disposing of [a motion under Rule 59] requires the party ... to amend a previously filed notice of appeal." Fed.R.App.P. 4(a)(4).
 
 
 14
 Sahm does not really dispute this specific analysis, but rather proposes a novel rule of appellate procedure: an appellate court is free to decide issues in front of it for the first time on appeal. Sahm relies on Pinney Dock and Transport Co. v. Penn Cent. Corp., 838 F.2d 1445 (6th Cir.), cert. denied, 488 U.S. 880 (1988), to support this position. Although Pinney Dock does allow such consideration, it does so only "to the extent the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of ... already protracted litigation...." Id. at 1461. We are thus confronted with an apparent conflict between specific rules requiring procedural compliance, and a general rule that might at least be construed to let this panel hear and rule upon any arguments it wants.
 
 
 15
 However, the rule in Pinney Dock appears relevant only to issues that are genuinely fresh in the court of appeals, not arguments that carry with them procedural baggage from the lower court. Sahm did raise these jurisdictional issues in front of the district court in his motion to alter or amend, hence they are not now an "issue not passed upon below." Not only were the issues passed upon below (the district court denied the motion tied to them), but they now come to us in violation of a clear rule requiring a new or amended notice of appeal. Sahm's arguments are thus twice removed from the Pinney Dock "fresh-argument" exception. They were argued below, and procedures to preserve them on appeal were ignored. For these reasons alone, we decline to entertain these arguments under the Pinney Dock exception, and limit our consideration to those issues properly appealed from the district court's order of January 10, 1995.
 
 III
 
 16
 Sahm filed his notice of appeal directly after the district court sustained the garnishment of the funds held by Mascagni. The two issues raised in the argument over this order are thus properly before the court. They are: (1) the validity of garnishment in the federal district court using state garnishment forms; and (2) the validity of the order of garnishment in light of the originally missing jurat.
 
 
 17
 Sahm argues, without citation, that the district court's decision to use state garnishment forms is "not the proper method of garnishment in Federal Court." Appellant's Brief at 24. Sahm never informs us of the correct method, however. Fed.R.Civ.P. 69(a) directs that procedures in aid of enforcement of a judgment "be in accordance with the practice and procedure of the state in which the district court is held...." We thus find no error here.
 
 
 18
 Sahm's corollary argument is that state procedure was not followed because the first garnishment form lacked a jurat, as required by state garnishment procedure. PNC acknowledges that the first garnishment form lacked the jurat, but advances several persuasive reasons why this defect should not lead to the reversal of the district court's decision to uphold the garnishment.
 
 
 19
 First, Sahm's argument that a defect of this nature requires invalidation of the entire garnishment effort is not well-founded in Kentucky law. Sahm cites Duo-Therm v. Sheergrain, 504 S.W.2d 689 (Ky.1974) for the proposition that Kentucky courts will invalidate a garnishment effort, based solely on a missing jurat. Though Duo-Therm did in fact invalidate a garnishment action for a missing jurat, it did so in a significantly different context than the present action. The Duo-Therm court invalidated a garnishment action under a specific statute that established a procedure for pre-judgment garnishment. It specifically noted that this degree of strictness was warranted by the otherwise harsh nature of taking a party's property before adjudication. Id. at 692. This statute was repealed in 1976, and the Duo-Therm holding does not appear applicable where another court has found that the defendant owes a sum certain, and the garnishing court is merely following a procedure to enforce the previous adjudication. In other words, the strictness concern stems from the peremptory nature of the garnishment in Duo-Therm and seems out of place in a purely administrative procedure to enforce an earlier substantive decision that a party owes another money.
 
 
 20
 Sahm's reliance on Kentucky Rule of Civil Procedure 43.13 is similarly misplaced, as this rule only requires an affidavit to have proof of the time and manner of its making without further elaboration of the results of non-compliance.
 
 
 21
 Kentucky courts have, in fact, allowed exceptions to the jurat requirement where there is other evidence that the affidavit was properly sworn. Monhollan v. Rice, 155 S.W.2d 223 (Ky.1941); Blackburn v. Commonwealth, 261 S.W. 277 (Ky.1924); Young v. Wooden, 265 S.W. 24 (Ky.1924). In Young, for example, an affidavit for attachment was accepted without a jurat in light of testimony by the attorney and clerk of the court to the effect that the attorney did swear to the statement and the clerk merely forgot to complete the jurat. PNC, however, wants us to equate these situations with its own in which the evidence does not show that their attorney swore to the affidavit, but rather implies he simply forgot to have it formalized with a jurat. The record suggests that PNC simply skipped this step altogether, and none of the Kentucky case law suggests that a court can overlook the requirement completely in this manner.
 
 
 22
 PNC also argues that the garnishment affidavit was a pleading subject to the strictures of Rule 11, Fed.R.Civ.P., and that this check serves the same purpose as the jurat--a formal penalty for misrepresentations. There are no cases on point about the interchangeability of Rule 11 requirements and strict compliance with the "jurat requirement," and it seems possible that the we might rule that pleadings and papers subject to Rule 11 do not need a perfected jurat. However, Kentucky too has a version of Rule 11, Ky.R.Civ.P. 11, and still requires the formality of a jurat. This suggests that there is some distinct function served by the jurat. The Rule 11 sanctions (loss of money) are arguably different from the punishment for making a false statement under oath (a class A misdemeanor in Kentucky). The bottom line, however, is that the jurat is a requirement of the Kentucky procedure borrowed by the district court, and PNC presents no clear argument for picking and choosing among the garnishment provisions on a case-by-case basis. We therefore decline to decide this matter on the basis that compliance with the jurat requirement is optional when a document is subject to Rule 11.
 
 
 23
 PNC does, however, present a convincing case that it met this requirement by amending its "pleading" (garnishment affidavit) in a timely manner, thus causing Sahm and Mascagni no prejudice. There are at least three reasons that the garnishment document filed by PNC on July 6 was legally effective as an amendment of its defective filing of June 29.
 
 
 24
 First, the amendment was permitted as a matter of course because it occurred "before" any pleading from Sahm. A pleading may be amended "once as a matter of course "at any time before a responsive pleading is served...." Fed.R.Civ.P. 15(a). PNC's pleading was amended on July 6 and filed as docket entry # 4. Mascagni filed (and served) a document labeled "RESPONSE ... TO ORDER OR GARNISHMENT," which was filed as docket entry # 5, presumably meaning it was filed after the amended garnishment. However, Rule 15(a) speaks of the "responsive pleading" being "served," not "filed," before the amendment. Rule 5(b), Fed.R.Civ.P. states that service of a pleading by mail is complete upon mailing, and it is at least conceivable that Mascagni's "RESPONSE" was mailed on July 6 at an earlier time than it was filed in court. Even so, when service by mail occurs on the same day as the amendment is filed, we hold that the purpose of Rule 15(a) is satisfied by allowing the amendment as a matter of course.
 
 
 25
 By focusing on service rather than filing, Rule 15(a) directs us toward the knowledge of the amending party, not the effect on the opposing party. If the rule focussed on filing (in which case the amendment here would clearly be proper), it might be that the drafters wanted to allow the responding party to forestall amendment by the act of filing an answer, for example, in order to prevent wasted effort by the responding party. However, where service is the key (which could occur several days after filing), the tenor is more that the amending party should not get to amend as of right while having knowledge of the response. Here, there is no such concern. We therefore hold that where the response is served by mail on the same day that the amendment is filed, an amendment may be interpreted as being "before" the service, so as to satisfy Rule 15(a).
 
 
 26
 Second, the amendment as of right can be forestalled only by the service of a "responsive pleading." Cases uniformly hold that a "responsive pleading" is solely one of the pleadings mentioned in Rule 7(a)--other responses, such as a motion to dismiss or a motion for summary judgment, do not suffice. See, e.g., Rogers v. Girard Trust Co., 159 F.2d 239 (6th Cir.1947); Kroger Co. v. Adkins Transfer Co., 408 F.2d 813 (6th Cir.1969); Roberts v. Husky Ind., Inc., 71 F.R.D. 479 (E.D.Tenn.1973); 6 Charles A. Wright, et al., Federal Practice & Procedure § 1475, 1483; 3 James A. Moore, Moore's Federal Practice § 15.07, pp. 15-33 to 15-35 (2d ed. 1985). The document filed by Mascagni is not labeled as an answer or other pleading listed in Rule 7(a). It is merely labeled "RESPONSE." It is more in the nature of a motion to dismiss, as it focuses on why the garnishment is procedurally defective, and even specifically states that the defendant should not be required to answer. It is true that one line of the "RESPONSE" states that "any averment not admitted by the Garnishee is generally denied," but that is not sufficient to make the document an answer under Rule 7(a). Therefore, the amendment was also timely under Rule 15(a) because no responsive pleading had been served.
 
 
 27
 Finally, even if the amendment would no longer have been permitted as of right, because of a difference of, at most, a few hours, between the service of a responsive pleading and the filing of the amendment, assuming the two arguments above to be invalid, the rule directs that leave to amend be freely given even after such a responsive pleading. The district court in fact treated the amendment as properly filed, in effect accepting it as an amendment. See 6 Wright & Miller, supra, § 1484, p. 601, n. 17; United States for Use of Dorfman v. Standard Surety and Cas. Co, 1 F.R.D. 239 (S.D.N.Y.1940); 3 Moore, supra, § 15.07, p. 15-32. And the court certainly should have so accepted it. No prejudice could be shown to Mascagni by permitting an amendment to correct a clerical error, and a ruling by the district court denying the amendment might well have been reversible error. See Foman v. Davis, 371 U.S. 178, 182 (1962); Tefft v. Seward, 689 F.2d 637 (6th Cir.1982); 6 Wright & Miller, supra, § 1487, p. 613.
 
 
 28
 Thus, for each of the above reasons, the amendment by PNC was proper, and the district court's judgment is not reversible because of the missing jurat in the first filing by PNC.
 
 IV
 
 29
 Sahm next argues that the funds held by Mascagni "cannot be attached by the Plaintiff because title remains in the name of the depositor, Mr. Gerhard Thun." Appellant's Brief at 30-31. Sahm's brief then argues that the funds in question were in escrow and did not belong to Sahm as if the district court had not already ruled on this question. See Appellant's Brief at 25-27. Since the district court has ruled on the question, however, our review of the facts is for clear error.
 
 
 30
 Sahm's argument that the money was not his is devoid of citation or analysis and fails to address the district court's careful factual analysis determining that the funds belonged to Sahm and enjoyed no special "escrow" status. See Memorandum Opinion, JA at 144. Sahm asserts, as he did before the district court, that Gerhard Thun wired the money, placed certain restrictions on its use, placed it into an "escrow" account, and retained some ownership interest in the funds. Sahm fails to take issue with the district court's findings that (1) Sahm owned the money because he agreed to borrow it from, and repay it to, Thun; (2) Sahm controlled the money and authorized it to be used to secure his release; (3) there was no specific agreement regarding the funds, as is required to place them in escrow under Kentucky law; (4) the mere assertion of escrow status was inadequate to create such status. JA 144-45. Sahm points only to a few letters in which Mascagni refers to the funds being "in his account." Appellant's Brief at 26. On this record, we find no clear error in the district court's fact-based determination that the funds were Sahm's, not in escrow, and thus subject to garnishment.
 
 
 31
 The remainder of Sahm's arguments in this section are predicated on the illegitimacy of garnishing funds in escrow. Having upheld the district court's determination that the funds were not in escrow, there is no reason to reach the question of the ability to garnish funds in escrow.
 
 V
 
 32
 Finally, Sahm advances a number of arguments regarding the manner in which he was "induced" to bring into Kentucky the funds later garnished, and the manner in which PNC found out about the funds. Citing cases on garnishing the property of prisoners while they are incarcerated, and cases dealing with fraud or trick used to lure property into a jurisdiction, Sahm levels a generalized complaint that he has been wronged by PNC's garnishment efforts. Sahm did not choose to bring this matter to the attention of the district court when he first contested its opinion of January 10, 1994, upholding the garnishment. Sahm raised it only in his later motion to amend or alter, which is not before us on appeal, as we indicated in our analysis in Section II. Even if we could review this claim, there is no factual record on which to base a decision. What facts there are (letters from Mascagni about the negotiations process) actually suggest that PNC did not induce Sahm to bring the funds to Kentucky, but rather that the idea was Sahm's from the beginning. Sahm's legal authority in this area is entirely defective as well. The cases about garnishment of a prisoner's property relate to property that has already been seized by authorities. In short, this entire area of argument is not subject to appeal, includes no record in support of an appeal, and is unsupported by any proper legal authority.
 
 VI
 
 33
 For the foregoing reasons the decision of the district court ordering the garnishment of the funds held for Sahm by attorney Mascagni is AFFIRMED in all respects.
 
 
 
 *
 The Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation